In the

# United States Court of Appeals

## For the Seventh Circuit

No. 10-1314

CURTIS CAMPBELL,

*Plaintiff-Appellant*,

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-01744—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 9, 2010—DECIDED DECEMBER 6, 2010

Before WOOD, EVANS, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Curtis Campbell appeals from
the district court's judgment upholding the Social
Security Administration's denial of his application for
disability insurance benefits and supplemental security
income. Campbell contends that the Administrative
Law Judge ("ALJ") who denied his application erred in
discounting the opinion of his treating psychiatrist and

in weighing the psychiatric medical evidence. We reverse the district court's denial of relief and remand with instructions to return this matter to the Commissioner.

## I. Background

On January 13, 2004, Campbell applied for social security disability benefits and supplemental security income. Although Campbell has physical impairments and limitations, this appeal concerns his mental impairments and limitations.

Campbell has a history of treatment for depression. On March 13, 2004, Myrtle Mason, M.D., M.P.H., conducted a psychiatric examination of Campbell at the agency's request. Campbell indicated that he had been depressed since 1986, but was not currently being seen by a mental health professional. He reported that his primary care physician had prescribed medications for depression: Zoloft, Lexapro, and Elavil. Dr. Mason concluded that Campbell's past treatment and hospitalizations had been mostly for substance abuse, not depression. Upon examination, Dr. Mason noted that Campbell was a little guarded intermittently during the interview, but found no evidence of any perceptual disorder or disturbance in form or content of thought. She diagnosed substance induced mood disorder and polysubstance abuse. Dr. Mason rated Campbell's current Global Assessment of Functioning (GAF) Scale as 60-75, indicating at worst some mild symptoms or some difficulty in functioning, but generally functioning pretty well. *See* Am.

Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (*DSM-IV-TR*) 34 (4th ed. 2000).

On April 6, 2004, Kirk Boyenga, Ph.D., a state agency psychologist, reviewed the record and assessed Campbell's mental functional capacity. Boyenga opined that Campbell was mentally capable of performing simple and detailed tasks as well as routine and repetitive tasks in settings with reduced interpersonal contact. In August 2004, state agency psychologist Bronwyn E. Rains and state agency psychiatrist Glen D. Pittman reviewed the record and affirmed Dr. Boyenga's assessment.

On May 7, 2004, Campbell presented at the Community Mental Health Council, Inc. ("CMHC"), for a mental health assessment which was conducted by Anne Crowe, LCPC, a clinical therapist. Campbell reported depression, decreased sleep, decreased appetite, anhedonia,[1] and a hopeless feeling. He said that he was not active and not motivated, but denied suicidality. He reported anxiety and impulsivity as well as auditory and visual hallucinations. He stated that he was going through a divorce and that he was consuming alcohol daily. Crowe thought Campbell's affect was depressed. She recommended a psychiatric evaluation, medication as needed, case management services, individual therapy, and a mental

---

[1] Anhedonia is the inability to experience pleasure in acts that normally produce it. Merriam-Webster, MedlinePlus, http://www.merriam-webster.com/medlineplus/anhedonia (last visited Dec. 1, 2010).

health assessment. That day, a psychiatrist at CMHC also saw Campbell. His affect was depressed and sad, but otherwise within normal limits. The clinician diagnosed Major Depression with psychotic features, history of polysubstance abuse, current muscle relaxant abuse and assessed a GAF rating of 40-45, reflecting some impairment in reality testing or communication or major impairment in several areas, such as work, judgment, thinking, or mood. *See DSMV-IV-TR* 34.

On October 19, 2004, CMHC psychiatrist Traci Powell first evaluated Campbell. She treated him regularly through the date of the ALJ's hearing, January 25, 2006, and thereafter. On mental status exam, Dr. Powell noted that Campbell had a flat affect, soft voice, fair judgment and insight, paranoid/suspicious thought, and auditory hallucinations. Her note states: "Reports using ETOH [alcohol] on a daily basis and states it helps to calm him." Dr. Powell noted that Campbell reported symptoms of depression and psychosis dating back ten years. She diagnosed Major Depressive Disorder with psychotic features and prescribed Paxil to address his depressive symptoms and Seroquel for psychosis and sleep disturbance. Dr. Powell rated Campbell's GAF at 45-50, reflecting serious symptoms or serious impairment in social or occupational functioning, for example, the inability to keep a job. *See DSMV-IV-TR* 34.

Campbell did not see Dr. Powell again until January 4, 2005. He reported that the past two months were "terrible" and that he continued to have anxiety attacks. Dr. Powell noted that "[h]e states his ETOH use has

increased" and that Campbell reported using drugs once since his last appointment. On his mental status exam, Dr. Powell noted that Campbell's affect was flat, his thought content was paranoid/suspicious, and he had auditory hallucinations. Her assessment included that Campbell "has not been compliant with meds and continues to use ETOH." She diagnosed Major Depressive Disorder with psychotic features and rated him 45-50 on the GAF Scale, again reflecting serious symptoms or impairments in functioning. *See DSMV-IV-TR* 34. Dr. Powell restarted Campbell's medications, increasing the dosage of Seroquel by 200 mg.

Dr. Powell saw Campbell on February 17, 2005. He stated that things were not going well, but was not forthcoming about what was happening. He reported using ETOH a few times per month and denied using illegal drugs. Based on her exam, Dr. Powell noted that Campbell's affect was flat, his thought content was paranoid/suspicious, and he had auditory hallucinations. She noted that he had not been fully compliant with his medications and was "using ETOH which is likely contributing to his presentation today." Dr. Powell diagnosed Major Depressive Disorder with psychotic features and noted the need to rule out the existence of a learning disability. His GAF score was 45-50.

On February 22, 2005, Dr. Powell completed a mental impairment questionnaire, assessing Campbell's impairments and functional capacity. She diagnosed Major Depressive Disorder with psychotic features and noted the need to rule out a learning disability. She identified

Campbell's associated symptoms as sleep disturbance, mood disturbance, anhedonia or pervasive loss of interests, paranoia or inappropriate suspiciousness, feelings of guilt/worthlessness, perceptual disturbance, and flat affect. In her clinical findings, Dr. Powell noted that Campbell's speech was hesitant, his affect was flat, he was positive for paranoia and auditory hallucinations, and his insight and judgment were fair. Dr. Powell noted that Campbell was not a malingerer. His prognosis was fair. His medications were Seroquel and Paxil. Dr. Powell indicated that Campbell had fair, poor, or no ability to perform mental activities required for even unskilled work. She found that he had the following functional limitations: moderate restriction in activities of daily living; marked difficulties in maintaining social functioning; constant deficiencies in concentration, persistence or pace; and repeated (three or more) episodes of deterioration or decompensation. She again rated his GAF score at 45-50, indicating serious symptoms or serious impairment in functioning, *see DSM-IV-TR* 34, and stated that his highest GAF rating in the past year was 45-50.

On March 17, 2005, Dr. Powell again saw Campbell who appeared somewhat dysphoric[2] and said he was dealing with family stressors. He stated that he was taking his medication, but estimated he missed it about once

---

[2] Dysphoria is a state of feeling unwell or unhappy. Merriam-Webster, MedlinePlus, http://www.meriam-webster.com/medlineplus/dysphoria (last visited Dec. 1, 2010).

a week. He reported some improvement in symptoms. The treatment record states that Campell continued to drink ETOH about once per week. Dr. Powell's findings on Campbell's mental status exam were essentially the same as on the prior exam. She wrote that Campbell continued "to have residual symptoms in the context of ongoing ETOH use." She rated him 45-50 on the GAF Scale. Dr. Powell switched one of Campbell's medications due to a recall, encouraged compliance, and encouraged abstinence from alcohol.

Campbell saw Dr. Powell on April 14, 2005, at which time he reported mood swings, sleep disturbances, problems with concentration, auditory hallucinations, crying spells, feelings of hopelessness, and alcohol use on a weekly basis. Dr. Powell observed that Campbell reported symptoms suspicious of Bipolar Disorder. She opined that his continued alcohol use likely exacerbated his symptoms, and noted that he took extra medication to combat the symptoms when they worsened. This time, Dr. Powell diagnosed Major Depressive Disorder with psychotic features and noted the need to rule out the existence of Bipolar Disorder with psychotic features. Campbell again had a 45-50 on the GAF Scale. Dr. Powell increased Campbell's medications and encouraged abstinence from alcohol.

On May 15, 2005, Campbell had his next appointment with Dr. Powell. He reported low appetite, worsening of auditory hallucinations, paranoia, and memory problems. He did not think the higher dose of one of his medications was helping. He stated that he continued to

use alcohol, but his use was very limited. Upon examination, Dr. Powell noted that Campbell's affect was flat and his speech was slow, but he had fair judgment and insight. She noted that he continued to be symptomatic despite reported compliance. Dr. Powell's diagnoses remained the same; she increased his medication and again encouraged abstinence from alcohol. Campbell's GAF score was still 45-50.

When Campbell saw Dr. Powell on June 21, 2005, he reported continued use of alcohol, but stated that his use had decreased. He also reported sleep difficulties, poor energy, auditory hallucinations, and paranoia. Dr. Powell noted that Campbell had flat affect, tangential thought process, paranoid/suspicious thought content, auditory hallucinations, and fair judgment and insight. She observed that his reported symptoms were consistent with Bipolar Disorder and that his mood symptoms and psychosis did not appear to be responding to his current medications. Thus, she changed some of his medications. Dr. Powell diagnosed Bipolar Disorder with psychotic features and noted the need to rule out ETOH abuse and a learning disability. She encouraged compliance and abstinence from alcohol. Campbell's GAF score remained 45-50.

On July 6, 2005, Campbell reported to Dr. Powell that he was experiencing physical pain that was exacerbating his depressed mood. He claimed he had been compliant with medication. Upon examination, Dr. Powell indicated that Campbell was cooperative and his motor activity was normal, his affect was flat, his thought

process was tangential, he was paranoid/suspicious, and his memory and insight were fair. She noted that he was having auditory hallucinations. She also indicated that Campbell continued to report symptoms consistent with Bipolar Disorder and that it did not appear that his mood symptoms and psychosis were responding to his current medication regimen. She diagnosed Bipolar Disorder with psychotic features and again noted the need to rule out ETOH abuse and a learning disability. Dr. Powell's notes for that day do not mention Campbell's use of alcohol. Campbell remained a 45-50 on the GAF Scale.

The next month, on August 16, 2005, Campbell admitted to Dr. Powell that he had used alcohol once to assist with his symptoms. He stated his mood had not been good. He reported that he had been without medication for two weeks and his symptoms had worsened. Dr. Powell's diagnosis was Bipolar Disorder with psychotic features and she noted the need to rule out ETOH abuse, learning disability, and narcissistic personality disorder. She encouraged abstinence from alcohol.

In mid-September, Campbell was seen at the CMHC and reported increased symptoms with sleep disturbance, hallucinations, lack of energy, and anxiety. He denied use of alcohol. His medication regime was changed.

Two weeks later, on September 28, Campbell saw Dr. Powell. He reported some improvement, but continued to have difficulty sleeping and auditory hallucinations. He denied alcohol use. The diagnosis was the same as the month before. Dr. Powell noted some im-

provement, but indicated that Campbell remained symptomatic. She changed his medications and recommended continued abstinence from alcohol. Campbell's GAF score was 45-50.

On October 4, 2005, Dr. Powell signed off on a medical evaluation form for Campbell, noting a diagnosis of Bipolar Disorder with psychotic features and the need to rule out ETOH abuse. She reported that his speech was slow, his mood was bad, his affect was flat, and he was positive for paranoia and auditory hallucinations. Dr. Powell noted that Campbell suffered from depression with sleep disturbance, crying spells, appetite disturbance, and passive death wishes. She indicated that he had extreme limitations in activities of daily living; social functioning; and concentration, persistence, and pace; and had experienced one episode of decompensation in the last twelve months.

Dr. Powell saw Campbell again on October 26, 2005. He reported compliance with his medications, yet continued to have sleep difficulties, auditory hallucinations, and depression. Dr. Powell's treatment note does not mention alcohol use. Her assessment remained essentially the same and she recommended continued abstinence. Campbell's GAF rating was again 45-50.

At his following appointment on November 23, Campbell was not very cooperative. His mood was "not good." He reported continued sleep disturbance. Dr. Powell noted that Campbell continued to have depressive symptoms but was resistant to change. His affect was sad. His speech, thought process, and thought

content were within normal limits, and his judgment and insight were fair.

Dr. Powell's treatment note for December 21, 2005, indicates that Campbell's affect was sad, his thought process remained circumstantial (which we understand to mean that his speech revealed "excessive attention to irrelevant and digressive details," Merriam-Webster, MedlinePlus, http://www.merriam-webster.com/medlineplus/circumstantiality (last visited Dec. 1, 2010)), and he felt paranoid. Campbell was cooperative in his interaction with Dr. Powell. His motor activity was within normal limits. His judgment and insight were fair. Dr. Powell noted that Campbell appeared to have symptoms consistent with post traumatic stress disorder. She did not mention any ongoing alcohol use. She changed his medications, tapering Paxil and starting a trial of Zoloft.

On December 22, 2005, Dr. Powell signed off on an Adult Mental Health Assessment form that appears to have been completed on September 14, 2005. The form noted that Campbell had daily anxiety, some compulsive behavior, daily agitation and irritation, auditory hallucinations (nightly), decreased appetite and sleep, and mildly impaired concentration. Campbell was cooperative and his motor activity was normal. Upon examination, Dr. Powell noted a flat affect, but Campbell's speech, thought process, thought content, and attention were within normal limits. His memory, judgment, and insight were considered good. His intelligence was estimated as average. The assessment rated

Campbell 50 on the GAF Scale, continuing to reflect serious symptoms or serious impairment in functioning. *See DSMV-IV-TR* 34.

ALJ Denise McDuffie Martin held a hearing on January 25, 2006. Psychiatrist Robert W. Marquis testified as a medical expert. Based on his review of the file, Dr. Marquis stated that Campbell has a history of cocaine abuse and dependence and was "currently using alcohol." Dr. Marquis acknowledged that Campbell's treating psychiatrist described him as depressed, but when questioned about the diagnosis of Bipolar Disorder, Dr. Marquis responded that he had not seen that in the records. The medical expert opined that Campbell had a moderate impairment in activities of daily living; a mild to moderate impairment in socialization; a moderate impairment in attention, concentration, and pace; and no decompensation. He opined that Campbell was capable of simple, routine, repetitive work. These opinions were made without consideration of Dr. Powell's February 22, 2005 assessment of Campbell's residual functional capacity. Dr. Marquis did not receive that assessment until the morning of the hearing and had not yet reviewed it. After he had an opportunity to review Dr. Powell's assessment, Dr. Marquis explained why his opinion of Campbell's functional capacity differed from Dr. Powell's. He relied on Dr. Mason's March 13, 2004, consultative examination which he thought was more consistent with Campbell's history of substance abuse treatment and hospitalizations.

Dr. Marquis stated that Campbell was "drinking currently." He identified Dr. Powell's treatment note for

October 19, 2004, which stated that Campbell "[r]eports using ETOH on a daily basis and states it helps to calm him," for support. He added that there were several notes to that effect in the record. Dr. Marquis testified that Campbell's psychotic features could flow from daily drinking and that alcohol withdrawal can cause hallucinations. Dr. Marquis stated that he could not give an opinion about Campbell's limitations in the absence of drinking; he did not see a period of clear sobriety and could not say whether Campbell would be any better without the use of alcohol.

Campbell testified at the hearing that he had not had a drink in six or seven months and "hadn't really drank before that." He claimed that at no point since April 2004 had he been drinking every day.

On August 24, 2006, the ALJ issued her decision, finding Campbell not disabled. In reaching that decision, the ALJ discounted Dr. Powell's assessment of Campbell's mental functional limitations and found the opinions of Dr. Marquis and the state agency medical consultants more informed and consistent with the record. The Appeals Council denied review. Campbell sought judicial review in the district court, and the court affirmed.

## II. Discussion

We will uphold the Commissioner's decision if it applies the correct legal standard and is supported by substantial evidence. *Castile v. Astrue*, 617 F.3d 923, 926

(7th Cir. 2010). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)). A decision denying benefits need not discuss every piece of evidence, but if it lacks an adequate discussion of the issues, it will be remanded. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Our review is limited to the reasons articulated by the ALJ in her decision. *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010).

Campbell asserts that the Commissioner's decision is not supported by substantial evidence. He argues that the ALJ erred in deciding to discount Dr. Powell's assessment of his functional limitations and by failing to apply the factors enumerated in 20 C.F.R. §§ 404.1527(d) (disability insurance) and 416.927(d) (supplemental security income) in deciding what weight to give that assessment. We agree that the ALJ's consideration of Dr. Powell's assessment is insufficient.

"A treating physician's opinion is entitled to 'controlling weight' if it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.'" *Larson*, 615 F.3d at 749 (quoting 20 C.F.R. § 404.1527(d)(2)). An ALJ "must offer 'good reasons'" for discounting a treating physician's opinion. *Id.* (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ gave two reasons for not giving controlling or great weight to Dr. Powell's assessment of Campbell's functional limitations: the absence of significant abnormal findings at the time of the Decem-

ber 2005 evaluation and the failure to investigate the possible effect of alcohol on Campbell's functioning. Neither of these qualifies as a "good reason."

An ALJ may not selectively discuss portions of a physician's report that support a finding of non-disability while ignoring other portions that suggest a disability. *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). The ALJ failed to evaluate the entirety of the mental health assessment reviewed by Dr. Powell on December 22, 2005. The ALJ focused her attention on section "V. Mental Status," instead of considering the six-page report as a whole. The ALJ correctly noted that Campbell's mental status examination was within normal limits but for a flat affect. But the ALJ ignored the sections for "Presenting Problem/Precipitants," "Diagnostic Formulation," and "Diagnostic Impression" that suggest greater mental limitations. The assessment relates Campbell's self-reported symptoms: daily anxiety, compulsions, daily agitation, daily irritation, and auditory hallucinations that keep him up nightly. In the "Diagnostic Formulation" section, it was noted that Campbell reported continued symptoms of depression, including anxiety, agitation, decreased appetite and sleep, and poor concentration. In addition, the mental health provider also reached his or her own conclusions about Campbell's mental condition. These are noted under Diagnostic Impression as a mood disorder and a rating of 50 on the GAF Scale, reflecting serious symptoms or any serious impairment in functioning, for example, being unable to keep a job. *See DSMV-IV-TR* 34. A GAF rating of 50 does not represent functioning within

normal limits. Nor does it support a conclusion that Campbell was mentally capable of sustaining work.

Furthermore, although Dr. Powell signed off on the mental health assessment on December 22, 2005, it appears the assessment was created by another mental health provider on September 14, 2005. Dr. Powell's most contemporaneous treatment notes were dated December 21, 2005. Yet the ALJ's decision does not mention them.

The Commissioner suggests that Campbell had more significant symptoms in July 2005. At that time, his affect was flat, his thought process was tangential, he was paranoid or suspicious, and he reported auditory hallucinations. But Dr. Powell's December 21 treatment notes contain similar findings: Campbell's affect was sad, his thought process was circumstantial, and he was paranoid or suspicious. The treatment notes show that Dr. Powell even changed Campbell's medications, presumably because his current regime was not achieving the desired result. The Commissioner suggests that Dr. Powell's findings from the December 21 examination were inconsistent with the December 22 assessment and that the ALJ resolved that inconsistency. In doing so, the Commissioner advances a ground on which the ALJ did not rely, in violation of the *Chenery* doctrine, see *SEC v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943). *See, e.g., Larson*, 615 F.3d at 749. Neither the December 21 treatment notes nor Dr. Powell's other treatment notes reflect much improvement in Campbell's mental functional capacity. Dr. Powell's observations and conclusions remained

essentially consistent throughout the course of her treatment of Campbell.

The other reason the ALJ declined to give controlling or great weight to Dr. Powell's assessment of Campbell's mental limitations was her failure to investigate the possible effect of alcohol on his functioning. Campbell had reported to Dr. Powell that he was using alcohol in October 2004 and January 2005. Dr. Powell's treatment notes from February 17, 2005, suggested that alcohol use may have been contributing to Campbell's presentation that day. But her notes for February, March, and April 2005, indicate a decline in his alcohol use that continued through August 2005, when he reported using alcohol only once in the prior month. The notes of Campbell's alcohol use are consistent with Dr. Powell's recommendations first of abstinence and then, beginning in September 2005, continued abstinence. The change in recommendation suggests that Dr. Powell believed Campbell was abstaining from alcohol use. Her earlier notes had indicated the need to rule out alcohol abuse, but as of November 2005, she no longer made that notation. This suggests that she had ruled out alcohol abuse, concluding that it was no longer a factor in Campbell's mental health.

However, Campbell's symptoms persisted, which suggests that something other than alcohol use was the cause. And in Dr. Powell's opinion, Campbell's GAF rating never got higher than 50, reflecting continued serious symptoms or serious impairment in functioning. Dr. Powell's records do not reflect that she made

any effort to corroborate Campbell's self-report of de-creased and discontinued alcohol use. Nonetheless, Dr. Powell apparently believed Campbell; her September 2005 note states that he denied using alcohol and indicated "continued abstinence encouraged." The ALJ did not identify any reason why Dr. Powell's assessment of Campbell's self-report was wrong. Nor did the ALJ analyze Campbell's credibility with respect to his state-ments at the hearing that he had not had a drink in several (six or seven) months. Although the record does not explicitly show that Dr. Powell investigated the possible effect of alcohol on Campbell's functioning, it does support a finding that she had concluded that Campbell was abstaining from alcohol. (Of course, if Campbell was abstaining, alcohol use would not be a factor in his functioning.)

Even if an ALJ gives good reasons for not giving con-trolling weight to a treating physician's opinion, she has to decide what weight to give that opinion. *Larson*, 615 F.3d at 751 (citing 20 C.F.R. § 404.1527(d)(2)). The ap-plicable regulations guide that decision by identifying several factors that an ALJ must consider: "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Id.*; *see also* 20 C.F.R. §§ 404.1527(d)(2), 404.927(d)(2). Our opinion in *Larson* criticized the ALJ's decision which "said nothing regarding this required checklist of factors." *Id.*; *see also* *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (stating that when the treating physician's opinion is not given controlling weight "the checklist comes into play"). Here,

the ALJ's decision indicates that she considered opinion evidence in accordance with §§ 404.1527 and 416.927. However, the decision does not explicitly address the checklist of factors as applied to the medical opinion evidence. And several of the factors support the conclusion that Dr. Powell's opinion should be given great weight: Dr. Powell treated Campbell for fifteen months; she treated him on a monthly basis; she is a psychiatrist; and her findings remained relatively consistent throughout the course of her treatment. Proper consideration of these factors may have caused the ALJ to accord greater weight to Dr. Powell's opinion.

The ALJ instead relied on the opinion of the non-examining medical expert whose testimony showed an unfamiliarity with Campbell's current condition. For example, Dr. Marquis missed Dr. Powell's repeated diagnoses of Bipolar Disorder with psychotic features. Dr. Marquis also misread Dr. Powell's notes as indicating that Campbell was still drinking on a daily basis. Only the October 19, 2004 treatment notes mention daily drinking. And apparently, Dr. Marquis missed the repeated references in Dr. Powell's notes to recommend or encourage "continued abstinence." Another problem with Dr. Marquis's opinion: he did not believe that Campbell had a "period of clear sobriety" by which to assess his functioning without alcohol use. Nothing in the record supports that view. To the contrary, the record indicates that Campbell had been sober for several months. Dr. Marquis's misreading of the record and his unsupported belief that Campbell was drinking alcohol daily undermines our confidence in his opinion.

The ALJ also relied on the opinions of the state agency psychiatrist and psychologist, but they had reviewed only part of Campbell's psychiatric treatment records. They did not have the benefit of reviewing Dr. Powell's treatment records—the records did not exist at the time. It seems that the mental health treatment records over a fifteen-month period, including the diagnoses of Major Depressive Disorder with psychotic features and Bipolar Disorder with psychotic features and a consistent GAF rating of 45-50 and never greater than 50, would affect the state agency reviewers' assessment of Campbell's mental functional capacity. Although an ALJ may give weight to consultative opinions, here, the ALJ did not adequately explain why the reviewers' opinions were entitled to greater weight than those of treating psychiatrist Dr. Powell.

### III.  Conclusion

The district court's denial of relief is REVERSED and this case is REMANDED with instructions to return the matter to the Social Security Administration for further proceedings consistent with this opinion.